Take a short recess and then finish for the day. We begin with New Orleans City v. Aspect Energy, Mr. Jones. Good morning, Your Honors, and please support. My name is Gladstone Jones and I appear this morning on behalf of the City of New Orleans. As your record will note, I've requested eight minutes for rebuttal. As a pretext, as we jump into the legal issues, I'd like to go back to the original state court complaint that was filed in this matter. That complaint's petition sets out that as Hurricane Katrina passed through New Orleans in August of 2005, levees protecting New Orleans began to break under pressure from the massive storm surge brought by that storm. What had gone wrong? This was a first for the recorded history of New Orleans in the state of Louisiana. The state of Louisiana and New Orleans set out to find out what just had happened. The answer was daunting. The loss of the coastal marshes surrounding New Orleans area over the previous 75 years or so had removed a critical coastal barrier that for 5,000 years had kept the water at bay from the City of New Orleans. Louisiana and New Orleans learned that the coastal marsh buffer had been lost in large part due to oil and gas activity that had been ongoing since around the 1920s. Set forth in the state court petition, the City of New Orleans cited Robert Bay, an engineer for Shell, who attested an affidavit. Now, we've read it all, so we kind of know the focus, your time, but I'm sure you have a reason to give us the context, but if you read all that, I mean, we read it. Yes. In short, Mr. Bay testified via the affidavit that oil and gas operations had destroyed the marshes and had created, in several important cases, the loss of the natural defenses that contributed to the unanticipated breaches of the flood protection system. Specifically, related to the matter before the court today, pipeline canals were constructed in the coastal marsh, typically 40 feet, and once the pipelines were laid into those dredged canals, the companies did nothing to keep the banks from eroding and becoming much wider than those original 40 foot wide canals as they were constructed. In many instances alleged in the state court petition, those canals became 100 feet, 200 feet, 300 feet, leading to the damage and the threat to the City of New Orleans. The City of New Orleans filed this lawsuit in 2019 to obtain objective relief to force the pipeline companies and oil companies to comply with the permitting requirements to protect against the levees exploding again and to avert the obvious massive damage that that would follow. The issue before you today is a relatively narrow one, but an important one for the City of New Orleans to be able to manage the coastal zone pursuant to the authority granted under the State and Local Coastal Resource Management Act. Specifically, the issue is whether the City of New Orleans has a reasonable basis for the claims it has pled against Energy New Orleans. It is well settled that the only issue when presented with an argument of improper joinder is whether there exists a reasonable basis to believe that the claim may proceed. The court's inquiry must focus only on whether the court has jurisdiction and not the merits of the case. It is without dispute that the City of New Orleans was— But you've been talking to us for three or four minutes about the merits of the case. Well, as set forth in the state court petition, to give the backdrop of exactly what the issue is here that's presented to the court and that was at the district court level. The City of New Orleans is an agent of the state that is enforcing the regulations that are set forth in the State and Local Coastal Resources Management Act. And that was the inquiry as to whether—as to what the district court was charged with doing that we suggest was in error as to how it proceeded. The real question comes down to is whether there's a reasonable basis for naming Energy and whether or not the city can enforce those regulations against Energy and whether there's diversity in this court. And is there a reasonable basis? Well, the overwhelming evidence that is before the court, both through what was presented to the district court in its original motion for remand and in the motion to reconsider, is that these acts and these statutes have words in them that have developed over time. They're specifically in the act. There's a discussion about individual and specific use. That act came out in the mid-'70s as a part of that overall strategy. Judge, these same arguments were made to Judge Guidry. He went through them seriatim, down the line, each of these arguments through the act, the exceptions, the exemptions, ad nada. So where did he go astray in terms of that? He had it all in front in his ruling. He went through it down the line. There was no dispute about improper joinder, et cetera. So tell us where he erred, how he erred. He erred first when he went on the expedition to look at whether the FEIS was legally binding, whether or not the FEIS was legally binding, and asked for additional briefing on that particular issue. The unmistakable conclusion, if you read the original blanket exemption that provides for individual specific use legally commenced, those terms, if nothing else, are entirely ambiguous. Well, wait, wait. The use of the term use, specific individual use, you're saying is ambiguous? Well, what does it mean? We know what it means because we know how the state, when it passed these, when it proposed the draft environmental impact statement and then followed that up with the- Why isn't the application of that phrase use, specific individual use in this case, unambiguous? It's laying down pipelines. Well, it's laying down pipelines in a canal that's dredged that was originally 40 feet. So it's laying down pipelines. It's laying down pipelines in a-  So they don't need a permit for that because that happened before the effective date of the act? Correct. Okay. So your view, it seems to me your theory is that at some point after that, they needed to get a permit. They absolutely- When was that? When there had become a significant change in their canals, one from 40 feet to- So, I mean, when was that? What date was that? The date was that when it happened. Well, it sounds like you're saying it's something that sort of happened over time due to inaction of energy. So, I mean, put yourself in their position. How are they supposed to know when they're supposed to get a permit? Well, they had every opportunity to participate in every aspect, just taking one step backwards, in not only the Coastal Zone Management Act, but also the development of the final environmental impact statement and everything. The regulatory authority to enforce that puts that burden on the entity that- But you're saying at some point they needed to get a permit from Louisiana? They absolutely needed to get a permit. Okay. They didn't need to at the beginning. Well, here's what we know about that. We've alleged in Record on Appeal Paragraph 70 that we don't know whether they were legally commenced or not. That in Paragraph 36 we specifically- I thought it was conceded that the original use didn't need a permit because it happened before- Specific allegation in Paragraph 36 and on the ROA at Number 70 provides that we did not concede that it was legally commenced. What we know today, if these pipelines were put in in 1920, what we know today is that they needed 40 feet back then, and today they're 125 or 150 feet. So we know that sometime between then, when they installed these, and now, they have significantly- What is the use that you're suing them over? The use that we're suing them over is that they are in absolute 100 percent control under- and it's very well articulated in the Louisiana Civil Code- that these pipeline companies control every aspect of not only their pipeline, but the canals that are dredged to put those- So, laying down the pipelines? Sorry, excuse me? You're suing them for the use as laying down the pipelines? And the widening of their facilities. Well, they didn't do anything to widen the facilities. That just happened. No, that's not exactly correct. We allege that these companies, pipeline companies, that we allege right there in the state court petition, that they had absolute foreseeable knowledge that this would occur, and that they had a responsibility under the Louisiana Civil Code to maintain and make sure that these canals did not exceed their original widths, and that they did not take up more land than they needed to use to host those pipelines. So the real allegation is that the use has changed. Not one of the lawyers here representing the appellees was going to disagree that the 40 feet necessary to host the pipeline when it was originally constructed is today 200 feet. The question is, whose responsibility is it to make sure that the original use is limited to its individual and specific use that has to be legally commenced? Whose responsibility is that? And whose responsibility is it to enforce the regulations when we go outside what is reasonably necessary to be hosting that pipeline when it was originally installed? And we know the answers to those questions. We know the answers to those questions because while maybe the words in the original act, the specific and individual use, and legally commenced, maybe they're ambiguous. But if they are ambiguous, we know how the state, the Department of Energy and Natural Resources, has enforced those. And we know exactly the guidance language that they submitted that has to be taken into consideration for the entire program to be accepted, and that is in the FEIS. If there's a significant change that's impacting coastal areas as a result of one of these uses, it is incumbent upon that particular entity to go out and get another use. So if you have a 40-foot pipeline and it becomes 200 feet, it is their job, their responsibility, to make sure that that is taken into account. It's kind of the reason that I started out with what is in the state court petition. The specific allegations here are, yes, you dredged a 40-foot canal. You did put a pipeline in it. You used it for that purpose. But now that same facility is 200 or 300 feet wide, and it is causing massive destruction in the coastal area because it has taken away this buffer zone. And what is the legal source of that obligation that you're asserting? Well, the legal source of that starts with the act and continues through the development of the regulations and how, frankly, the Louisiana Department of Energy and Natural Resources interprets those exact regulations. What does specific and individual use? You don't have to take it from the city of New Orleans. We have submitted evidence as to how the Louisiana Department of Energy and Natural Resources interprets that, and there's no mistaking how they interpret that. They have taken the initially draft environmental impact statement that was posted through the Louisiana legislature. It was absolutely necessary for the state of Louisiana to get approval for that from the federal aspect, and they did. They went through the legislative process. It became a part of the interpretation of the original act. Well, clearly you want to be in you. Your client, the city, wants to make those robust arguments in state court. No doubt about that. All that you've argued about use, et cetera. The problem is you're in federal court. There's no dispute that I can discern that a party was improperly joined. The district court refused to remand this to state court where you and the city would prefer to be because there's complete diversity. So you've told us about the rest of it. I'm still stuck on where did Judge Guidry go wrong. As to reverse, I heard you say he went wrong construing the act. I'm on complete diversity here. He declined to remand this to state court because when the nondiverse party was taken out of the equation, he found that there was complete diversity, ergo the cases in federal court. So help me at least understand why that's reversible error. Thank you, Judge Stewart. I'll be happy to. Well, first off, we believe that he came to the wrong conclusion with regard to energy and that they are nondiverse and that this should be sent back on that basis alone. Also, it's very clear that the city of New Orleans is, in fact, an agent of the state authorized to enforce these regulations and that all benefits, any benefits that result as a disenforcement action, are going to go and be a part of the state as a result of what the amicus brief submitted, which is the all proceeds or any remedies run to the benefit of the state. If that's so obvious, why was it an argument that wasn't even presented until the reply brief and then the amicus brief? Well, in hindsight, maybe we should have added in, said the state. But as the court well knows, we, subject matter of jurisdiction. Yes, and we do understand that. That's not the question, but it just seems to me that it can't be very obvious if you left it to the reply brief. That speaks for itself. Well, there is, I mean, the city of New Orleans is absolutely allowed and authorized to pursue these claims on behalf of the state. Well, of course, in all the other, there have been lots of other lawsuits and claims filed, and all of those other parties included the state, right? They did. And yours did not. Why is that? Well, the city of New Orleans, through its home rule charter, had the ability to, did not have to have the state. Although it is absolutely an agent and beneficiary of the state, there's really no mistaking that at all. So the city could, there were other lawsuits going on around the state, and the city of New Orleans elected to pursue its own claim. So, if I can go back to Judge Stewart. I hadn't forgotten my question. No, sir, and I'm trying not to forget to answer it. So, if I could go back to you. With regard to energy, with regard to energy and how the court treated energy, there's no mistaking that energy is a Louisiana entity. There's no mistaking that they had a pipeline. There's no mistaking that the allegations in the state court complaint allege that that pipeline is no longer being used for its individual use or its specific use for what it was originally intended to be. And there's also no real dispute that the final environmental impact statement was well deliberated in the state of Louisiana. It was an integral part of the ultimate approval of this program in the state of Louisiana. And similarly, but a little bit separately, if there's any question as to whether or not the city of New Orleans has a reasonable basis to make a claim and enforce those regulations, while the court could look and end the analysis with the final environmental impact statement, how exactly the state of Louisiana through the Department of Energy and Natural Resources has treated these regulations and its interpretation of what constitutes individual and specific use and lawfully or legally commenced should be enough to answer the question as to whether or not the city of New Orleans has a reasonable basis to pursue a claim against energy in enforcing these regulations. Well, you know, as I know, Judge Guidry, the trial judge, served eminently for years on the Louisiana Supreme Court. So he clearly knew, understood all the claims about the state, the involvements, the rules, etc., etc., etc. But when he got to the point of remand, he said, there's complete diversity. The case is here. It didn't turn on the construction of the agreements, but there being complete diversity. There was an argument in the brief about Smallwood and so on and so forth. So what's your argument? You all argued Smallwood sort of governed this. So what's your point here? You still rely on what you said in the brief? That somehow Smallwood gets you over the hump in terms of getting back to state court? Well, Smallwood is definitely relevant. I mean, you need not look much further than the record in this case that upon Judge Guidry's ruling, I mean, a number of . . . Let me ask you a question in a different way. What is the holding you want this panel to enunciate if it accepts the arguments you make? What is the holding that we would render with respect to what's on appeal to us, the district courts declining to remand the case? What's the holding and how would we say it? The holding, with all due respect to Judge Guidry, where we think he erred in the holding that we request, is that when answering the limited, narrow question of is there a reasonable basis for which the City of New Orleans can prevail against energy? And the answer to that is based upon the record and everything in the record is yes, there is. And there are multiple reasons for that. And there's three basic ones that I would provide. Number one, in the original act, the individual specific use and legally commence. Number two, the way that FICE has been incorporated into and was a necessary component of having the state's entire program approved by NOAA. That is very important. It may not be a part of the Louisiana law in that it was legislatively draft, but there's no mistaking that when Judge Guidry said it's not a part of the substantive legislatively passed law, he continued on to say or otherwise has been incorporated into Louisiana law. There's no question that that process between the draft environmental impact statement, the final environmental impact statement went through the legislative process and became approved. And then most importantly, on the reasonable basis question in terms of a claim against energy, how would the Department of Energy and Natural Resources regulatory agents enforce this? How do they interpret their enforcement regulations? About the same time that all of this briefing was going on before Judge Guidry, in another case, as we briefed over in Cameron Parish, they were having a summary judgment hearing on nearly this exact question. There were competing cross-summary judgment motions. And that court, along with the Third Circuit Court of Appeals, found that the final environmental impact statement provided clarity to the original act, the individual use, specific use, et cetera, and concluded that those exceptions applied in that particular case. Is that instructive? It was not available when Judge Guidry originally issued his ruling. That case, they submitted a tremendous amount of factual evidence as to how the regulatory agencies addressed these terms that we're discussing today. It was all in the context of a summary judgment hearing. Of course, here we're not on a summary judgment hearing. But we did, because Judge Guidry asked for that briefing, we did submit that briefing in a motion for reconsideration. All right. Thank you, Mr. Jones. You've saved time for a bubble. Thank you. Mr. Stanley? Good morning, Your Honors. Rick Stanley here for Entergy New Orleans. I'll use my time this morning to address the factual and procedural background of the case, and Mr. Clement will address the improper joinder issues, but I'm sure we'll cross over on a few points. My client is a public utility that provides electricity and natural gas service to customers in New Orleans. Although, as you have heard, there have been numerous other cases about coastal erosion lawsuits in Louisiana, no Entergy operating utility has been joined as a party in any of those other suits, and that is for a very good reason. Despite the allegations in the suit against, quote, all defendants, close quote, my client is not an oil and gas exploration company. It does not drill for, extract oil, gas, or minerals. It does not own or use any waste pits. It does not engage in the production operations of an oil and gas company. These are the discreet and undisputed facts that this court should consider as part of the improper joinder analysis, as the court found in Jack V. Avonic. What my client did do, well prior to 1980, was acquire or construct three pipelines to carry natural gas to the city for its customers. Portions of these three pipelines traverse parts of the coastal zone of Orleans Parish. The pipelines have been buried or submerged since they were built or acquired, and remain so today. It was apparent from the start that my client should never have been joined in this case. At the time of Chevron's removal notice, we consented to removal and immediately raised the issue of improper joinder. The basis for our position was straightforward. No permit was required to construct any of these pipelines decades before the statute was enacted, so there can be no violation of a permit. And second, there is no current use that would require a permit now. The pipelines simply exist where they were built and transport natural gas to the city to distribute to the citizens and customers in New Orleans. Entergy's entire operation, therefore, falls within the historical use exception under the very plain wording of the statute. The city has argued, and did so again this morning, that despite this exception, a claim can exist for a violation based on the alleged widening of the canals over time. The theory is that when the pipeline was installed, maybe as far as 60 or 70 or 80 years ago, an implied duty would arise later at a time unknown to require continuing maintenance to keep the canal to its original width whenever the pipeline was constructed. That position is deeply flawed for two reasons that Judge Guidry noted. First, the statute. The position is simply at war with the unambiguous statutory text and would render the historical use exception meaningless. The statute literally creates an express exclusion for any lawful use that predated it, and there is no contest that this was a lawful use prior to the statute. Second, it's at war with the Louisiana regulations. As the plaintiffs cite and note in paragraphs 24.1 and 24.2 of their petition, canals are linear facilities that, even if constructed after 1980, only have to be planned, designed, located, and built to prevent bank erosion. Neither of the quoted regulations imposed any future duty of maintenance of those canals. By contrast, paragraph 24.3 of their petition quotes the Louisiana regulation for mineral exploration and production facilities, which, by contrast, do include an obligation to, quote, maintain, close quote, those facilities. So that maintenance obligation is not present in the very regulations that Louisiana enacted to enforce the 1980 legislation. The city simply cannot reasonably contend that the mere transmission of natural gas through a pipeline constructed decades and decades ago has caused or hastened the alleged erosion of the banks of the canals. My opposing counsel mentioned that, well, we really meant to add the state as a party, but we didn't do so. Well, it's not in the petition, and they are the masters of their complaint. There is no dispute that, as a home rule city, the city of New Orleans is not a nominal party to this case. So there's no reason to engage in any kind of real party and interest analysis. The question is framed slightly differently, though, which is whether the state is the real party in interest. I mean, in theory, the state could be the real party in interest, even though they may not have said so in their petition. It could be, Your Honor, Judge Smith, but in this case the city also has an interest that it's suing for, and it is a real party in interest. The state could have intervened, the state could have joined, or the city could have also sued in the name of the state. None of those three things occurred. And so I think there's no question that the case was properly removed. There was some mention of the civil code, and I would just point out to the court, but I don't recall any mention of any civil code petition in the petition itself. I want to be sure you get to the F-E-I-S argument while you still have time. I'm going to defer to Mr. Clement on that. Okay, we'll talk about that. But unless the court has any questions about the energy portion of this, at least with respect to those specific facts, I'll defer the rest of my time to Mr. Clement. All right, Mr. Clement. So Mr. Clement will get 23 minutes. Good morning, Your Honors, and may it please the court. Paul Clement for the diverse defendants. As the Council for Energy New Orleans just emphasized, energy shares little in common with the other defendants in this action. Most of the city's allegation concerns activities that energy has never engaged in. What explains energy's presence on the defendant's side of the V is not its shared involvement in extracting oil or handling waste pits. Instead, energy was tacked on in this suit in a transparent effort to avoid federal jurisdiction. But the doctrine of improper joinder exists to prevent just such gambits, and the doctrine is fully applicable here because the city has no reasonable prospect of prevailing against energy in light of the clear statutory exemption providing that uses commenced before September 20, 1980, shall not require a permit. The city seeks to avoid that result by claiming there's an unwritten exemption or exception to that shall not require language for uses that lawfully commenced before September 20, 1980, but subsequently engendered more significant environmental impacts at some later undefined point in time. But the plain text of the statute provides no such exception to the exception, which would contradict the legislature's deliberate decision to protect reliance interests by requiring permits only prospectively for uses commenced after the law's effective date. At most, the city can trace its perceived exception to the exception theory to language in the environmental impact statement, which lacks binding force and decidedly is not the governing law of Louisiana. Both the statute itself and the duly promulgated regulations are crystal clear that uses commenced before September 20, 1980, shall not require a permit, full stop. That forecloses the city's claims against energy and means the case against the diverse defendants should proceed in federal court. And just to underscore, and I know Judge Duncan sort of elucidated this point in one of his questions, but part of the problem with the city's theory here is there's no obvious commencement point at which they think that energy needed a permit. It's at some point in time because of the passage of time or because of negligence in maintaining the canals. But you can't get a permit for the passage of time. You can't get a permit for negligence. And the whole permitting regime, both the grandfather clause and the basic requirement to get a permit, are all key to the commencement of a use. So to the extent the city's whole argument essentially depends on something where they can't even pinpoint, the point at which a use commenced or some new different use commenced, I mean, just shows that this is a nonstarter under the statute and they have no reasonable prospect of success. To the extent a use commenced, it commenced long before 1980, and the city can point to nothing in all the years since other than inaction and alleged negligence, and those aren't the kind of things that either commence a use or you can even get a permit for. On the specific point about the environmental impact statement, I mean, that just doesn't have any force of law anywhere. I mean, under federal law, you know, NEPA is a procedural statute. The environmental impact statement is the representations at that time of people's best guess as to whether the new program is going to have a significant environmental impact. And when that happens, if it's sufficient, there's no NEPA violation, and going forward there's no binding effect of the environmental impact statement, not under federal law, not under state law. What is binding is the regulations and the statutes, both of which fully support our position. And, you know, I think it's just not a fair burden on the regulated parties to try to dig up an environmental impact statement submitted to a federal agency in 1978. I mean, that's, you know, and then try to, it's like over 200 pages long, and they're supposed to figure out where their obligations are? No, their obligations are to look at Louisiana code and the Louisiana regulations that are specifically on point, and there's no discussion there of any exception to the exception for preexisting uses. And that's actually, that's generally true, but it's even reinforced by the specific language in the statute at issue here in 49.214.22, and this is subsection B. This is the general legislative purposes of the statute, and the legislation specifies to express certain regulatory and non-regulatory policies for the Coastal Zone Management Program is one of the purposes. And then it says regulatory policies are to form a basis for administrative decisions to approve or disapprove activities only to the extent that such policies are contained in the statutes of the state or regulations duly adopted and promulgated pursuant thereto. So this very statute specifies that the binding obligations are in the statute and the regulations, not in some 200-page environmental impact statement tucked away in the bowels of the Department of Interior. And it goes on to say that to the extent there are non-regulatory policies, such policies are not binding on private parties, which again underscores just not a reasonable burden to put on a private party. One of the other arguments that you hear from my friends on the other side is that somehow this language about individual specific uses is particularly critical to their argument. And with all due respect, that language carries no weight in properly interpreting the statute. I think if you look at the structure of the statute, you can understand why those words are there. What work are they doing in the statute, individual and specific? So I think what they're doing is they are distinguishing the grandfather clause exceptions, which are specific to individual uses, from the general exceptions or categorical exceptions in subsection A of the same statutory section, which I would think of as being more general exceptions. You have a general exception for hunting and fishing. You have a general exception for maintenance operations on existing structures. So all of those things, I would say, are the general exceptions. And then the individual and specific ones are the ones that are specific to a particular pipeline, a particular project. And that's the only work that they do in the statute. And I think that's underscored. If those words were significant, then you'd think they'd at least be repeated in the regulation. But the regulation manages to describe the grandfather clause and doesn't use those words at all. The regulation just says, blanket exemption, no use or activity shall require a coastal permit if the use or activity was lawfully commenced or established prior to the implementation of the coastal use permit process. Do you know, is there an allegation in this case that the pipelines were not legally commenced or established prior to the effective date? I don't believe there is such an allegation. I think my friend has a theory that somehow it's lurking in paragraph 70 or something. But there's no specific allegation of that. We had sort of understood that it was essentially common ground among the party that that was established. It also, and this is something that the Entergy brief specifies, but as to Entergy in specific, there's this kind of unusual dynamic that in order to avoid the possibility of being covered by an earlier bankruptcy discharge, the city has stipulated that its claims essentially arise after 2007. So in the context where their claims arise after 2007, I just don't see how they can seriously take issue with the legality of this. And, of course, there's no allegation here that there's some permit that Entergy was supposed to get or Entergy's corporate predecessor was supposed to get and didn't get for these canals. And it certainly wouldn't have been a permit under this statute, which didn't exist. Presumably someone could commence, legally commence an individual's specific use and then change the use, have a new use post an effective date. Is that being alleged here? I don't think it's being alleged in terms and then I think whatever scope there might be for that, you would have to have some new action, some new activity. And what is specifically alleged here and what you see particularly in their briefs before this court is they're all about inaction and negligence. Their beef with Entergy, to the extent they have any real beef with Entergy, is that they didn't do more. And so if Entergy had decided of its own accord for some reason that we're going to redredge every one of these canals and deepen it, that would be a new use and that might be something where you'd need a permit. And at that point, you'd at least have like a discrete moment in time where you could say, all right, we're going to do something different. Now, maybe there's an argument that that's just a continuation. Maybe there's an argument that that's a new use and there's some line drawing to be done there and maybe a regulated party would go to the agency and say, do we need a new permit at this point? But there's just nothing like that when it's in inactivity and it's inaction or it's negligence. And as we suggest in our briefs, I think the problem with the city's conception of this is it's not just contrary to the statute. It's really antithetical to the whole notion of a permitting regime. And that's why I think it's telling that both the requirement to go get a new permit is based on commencement of the action. And the grandfather clause is also legally commenced or established at the time of the permitting regime. And if you read that together, it makes perfect sense. If you've been doing something before you could even get a permit under this act, you can keep doing it. If you do something new and different that's a new action, you need a permit. But simply failing to do a good enough job maintaining the canals or just continuing to operate the pipelines, that can't be enough to cause you to need to go get a permit and can't be enough to cause you to lose the protection of the grandfather clause or you really don't have a permitting regime. And the whole reason the grandfather clause is in there is to protect the reasonable reliance interests of entities like energy that have been operating since before the permitting regime. I do want to spend a moment just talking about the amici argument about the sort of, you know, some idea that even though the city did not name the state as a plaintiff, somehow there's still some jurisdictional problem with that. Judge Smith, you know, I think the relevant question here is whether the city is just a nominal party, and I don't think the relevant issue is whether the state is a real party in interest. Because I think the law is pretty clear. If the city is a real party in interest and the state is also a real party in interest and the city could have joined the state but didn't, that's not enough to create a diversity problem. Unless the city is only a nominal party, then they're stuck with their decision to sue in their own name and not add the state as a plaintiff. And I think that's what the law supports. And so, you know, it may be that, you know, at some level the state is, you know, has an interest in this suit. And if the state decided it wanted to intervene in this suit, maybe it would have a basis to intervene in the suit. But that wouldn't be a problem because, obviously, diversity jurisdiction has to be judged from the time of the filing of the complaint. So the only way that there would be a problem is if the city just is a nominal party that has no business bringing this suit. And that's clearly not the case for two reasons, I think both of which are independently sufficient. I mean, first of all, when you have this kind of government entity that is specifically empowered by the statute to sue, I mean, that's enough to make them a real party in interest under this court's case law, which we cite in our brief. So just the very fact, like even if the city couldn't keep some of this money or didn't get a benefit from the injunctive relief, the very fact that they are a party that's an independent party that can enforce the statute is enough to make them a real party in interest. Doesn't the statute make some reference to the power of the city to sue on behalf of the state? I don't think it does. I think, I mean, and certainly not, there's certainly no argument that the only way that they can sue is on behalf of the state. So, and that's why if you look at those other suits that were brought by the other parishes that have filed the amicus brief, they've all sued in their own name and as ex rel the state, but they sued separately in both capacities. And I think their theory is they can sue on their own. They didn't have to add the state, but they did, and so maybe they don't have the problem that the city does here. But they're stuck with their voluntary decision not to file. And it's also worth recognizing, I don't know quite how to read what the city told you this morning, but I understand the position of the parishes in those other cases is they get to keep the money they recover in these suits. They have to use it for purposes that help the states, but, you know, they're going to keep the money. So it's not like, and that's the second independent reason, which is even if you're talking about a private party, you know, if you are somebody who, there's somebody else who might also benefit from your lawsuit or might be precluded by your litigation if you sue and lose, as long as you are not a nominal party and you also have some stake in it, some recovery in it, then that's enough to establish your diversity jurisdiction, your citizenship for diversity purposes. And then the fact that, and this court's precedent and the Supreme Court precedent are directly on point. The fact that there's another party that you could have added that might have destroyed complete diversity, doesn't matter if you didn't do it. You know, it's like, you know, if you think afterwards, oh, if only we had named this party, then that would be sufficient to destroy diversity. Doesn't matter. You judge it from the time of the filing of the complaint. So at the time of the filing of the complaint, only the city was a plaintiff. They are a real party in interest, and that's enough to sort of answer that question, I think. And, you know, to that end, and Judge Smith, you alluded to this, but to that end, there is, you know, there's a reason this never occurred to the city until it saw an amicus brief and then filed its reply brief. I mean, they're perfectly authorized under the statute to bring this action, and so they brought the action in their own name. They stand to recover. That's, I think, sufficient on to the day. So unless the court has any further questions, I think I've covered the material I hope to cover. I think under the language of the statute and the regulations, which is all that matters, the case against energy is just open and shut. There's no reasonable prospect that the city can prevail in this case, and that's enough to get them out of the suit. And at that point, it's conceded that there is complete diversity and the rest of this case should proceed against my clients in federal court. Well, you heard my question to counsel. I asked him what the holding should be. He gave me what the opinion should be. In terms of narrowly, but back to this complete diversity, as I said, I understood there was no dispute that there was an improperly joined party. And what's here is the scope of this remand. Obviously the agreement is here, but the narrow piece that's appealed to us is whether Judge Guidry erred in failing to remand the case. Is there any serious dispute that there is complete diversity? Yeah, I don't think there's any dispute that once energy is out of the case, there's complete diversity. So to the extent that's the narrow question you're focused on, I don't think there's any argument. I do think what my friend was trying to say as well, they still think that there was an improper joinder because they had a reasonable basis to proceed against Entergy. But for all the reasons I've said, we don't think that's at all true. And I also think that, as was alluded to, I think by you, Judge Stewart, Judge Guidry is a great district court judge, but it's hard to ignore the fact that he served on the highest court of the state of Louisiana and probably has a pretty good insight into the law of Louisiana, which was the basis for his holding that there's no reasonable basis to proceed against Energy. Just since I have a second, and it could come up in rebuttal, and I just want to preempt it. I mean, there's no Smallwood problem here. And Smallwood says that if there's an issue that takes out the whole case against everybody, then that's not a proper improper joinder argument. But some of the allegations of the city against my clients involve post-1980 conduct, where they do say that based on post-1980 conduct, we should have gotten a permit. So there's not a Smallwood problem with the particular argument that affects Entergy here. Thank you, Your Honors. Thank you, Mr. Clement. Mr. Jones for a vote. Thank you, Your Honor. Just picking up on Mr. Clement's statement that the city is not just a nominal party, do you agree with that, or is it the fact that the city is only a nominal party and that the state is the real party in interest? We believe that the state is the real party in interest according to the statutory law. So I just want to be sure I understand your position. You are now saying that the city is only a nominal party. It is in connection with its authority under the state. That is correct. I mean, there's no disputing that in 2014, I mean, that all remedies are going to flow back to the state. There's no disputing that the parish is to enforce the state's concerns. I mean, that's right out of the statute. And that's the law that's provided. They have overlapping ability to enforce, and the rights are delegated down to the city, which is what the city of New Orleans did. Any other questions on that? I'd like to turn to a fiction that some of the argument suggested by my friend and adversary suggests that the final environmental impact statement is some document that's buried. It's 200 pages, and it's in the basement up at the Louisiana Department of Energy and Natural Resources. Nothing could be further than the truth, as its tortured history is explained in all of the briefing that's been submitted to this court. It has been raised at the legislature. It has been put up for hearings. It has been a part of the whole process. And, in fact, most importantly, it is how the Louisiana Department of Energy and Natural Resources has been enforcing and taking on the words in the original act. That is undisputed in this case. Now, going back to Judge Guidry, with all due respect to his service on the Louisiana Supreme Court, this is undoubtedly a question of first impression at a federal court level. Almost simultaneously at the time that Judge Guidry was taking this on, the court, faced with a very similar question on summary judgments after the development of facts, found just the opposite, that the final environmental impact statement had gone through the process, that it was enforced by the Louisiana Department of Energy and Natural Resources, and then that matter was challenged in a writ process under Louisiana appellate law, and that writ was denied by the Third Circuit Court of Appeals. So we've had four judges in the state of Louisiana that have looked at the basic question, whether there's a reasonable basis to believe that a claim just like those asserted against energy would be successful. And if the court would have focused narrowly on that question at the district court level and elected not to go out and ask for briefing additional on the question of whether it was legally binding and would have just stayed focused on the very narrow question, whether there was a reasonable basis under the terms of the act as alleged in the state court petition, then we may have had a different outcome. There is also no dispute that there was reams and reams and reams of evidence submitted by the defendants in connection with the request for additional supplemental briefing by Judge Guidry. We went right back to the final environmental impact statement, which is what the regulators testified that they were enforcing in connection with those terms that are set forth in the act. But I do want to focus on a question that was just asked, whether or not the city of New Orleans alleged that the initial installation of these pipelines were lawfully commenced. The answer is, is that paragraph 36 on the record of appeal, on number 70, it's absolutely alleged that they were not legally commenced. There's no getting around that. So I want that to be clear. That was a part of the original state court petition. And the reason for that is very, as context, is very simple, is that the use and the construction of these canals at the time is, we know, it's not disputed that those canals are much, much, much wider than they were, than when they were originally individually put into their specific. Are you alleging that when the pipeline was originally placed, they needed a permit? There was no permit to be gotten at that particular time. Because it was before the effective date. It was before the act. So if it was not legally commenced, under what law was it not legally commenced? What happened then is they had Army Corps of Engineers permits that were in place that dictated what the construction of those lines would look like. And so when we had our petition, we alleged that it was exceeding those. So there was no permit under this act because it was prior to 1978, but there were permits that were required separately under different regimes, which led us to the paragraph number 36 in Record of Appeal of number 70. In conclusion, I really want to emphasize that these terms, individual specific use, legally commenced, have never been addressed by a federal court or a state court until recently as a result of all of these other cases. And when it was, those courts, that court in Cameron Parish and the Third Circuit Court of Appeals when taking it up, decided that FICE was actually being, FICE, the Final Environmental Impact Statement, was being enforced and it was consistent with the regulatory mandate. It would be, we respectfully submit that Judge Guidry got it wrong and he went beyond a simple inquiry as to whether there was a reasonable basis under any of the terms meeting the facts most favorable to the plaintiffs. When he asked for the additional legal briefing and when he ignored the Final Environmental Impact Statement and then particularly when he ignored or decided not to give credit to the facts set forth in the summary judgment process over in Cameron Parish. If you have any further questions, I'll be happy to respond to those. Thank you, Mr. Jones. Your case is under submission. Thank you all.